## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ISRAEL D.,

      Plaintiff,

      v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

Case No. 19-CV-07666

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Israel D., who suffers from epilepsy, a seizure disorder, and depression among other things, seeks reversal under 42 U.S.C. § 405(g) of an administrative law judge's ("ALJ") determination that, despite his impairments, he does not qualify as disabled. [11]. The Commissioner seeks an order affirming the ALJ's decision. [17]. For the reasons explained below, the Court denies Plaintiff's motion [11], grants Defendant's motion [17], and affirms the Commissioner's decision.

## I.    Background[1]

### A.    Procedural History

In May 2017, Plaintiff applied for disability insurance and supplemental security income benefits, claiming that he became disabled on September 3, 2016 at the age of 28 from chronic uncontrolled seizures, chronic asthma, high blood pressure, migraine headaches, and various cognitive and psychological disorders, among other things. R. at 399–406, 425, 508–11. He had previously applied for disability, claiming

---

[1] The Court draws all facts from the Administrative Record, [8], hereinafter referred to as "R."

disability as of 2011 for similar alleged conditions, but another ALJ denied that claim on September 2, 2016. R. at 110.

The Social Security Administration ("SSA") denied his renewed application on October 17, 2017, and upon reconsideration on December 14, 2017. R. at 110. Plaintiff, who then obtained legal counsel, requested a hearing before an ALJ and, on November 9, 2018, ALJ Carla Suffi—after conducting a hearing in which Plaintiff and his girlfriend testified, as did a vocational expert ("VE")—issued a written decision finding Plaintiff not disabled as defined under the Social Security Act ("the Act"), R. at 107–24. The Appeals Council denied Plaintiff's request for review on September 23, 2019, R. at 1–4, making the ALJ's decision the final decision of the Commissioner and ripe for this Court's review, *see Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

### B.    Medical Record Evidence

In 2010, Plaintiff fell out of a window and suffered a head injury. R. at 178. At some point thereafter, he began to experience seizures and, in 2011, doctors diagnosed him with epilepsy. He has suffered periodic seizures since 2011 and has received treatment at emergency rooms as needed, as well as through Rush University's Epilepsy Center with advanced nurse practitioner Deborah Zielinski. R. at 534–838, 938–54. Focusing on records following the date of Plaintiff's alleged disability onset, Ms. Zielinski's July 2017 treatment notes state that Plaintiff reported 1–2 convulsive seizures per week, no seizure-free month since March 2017, but no staring seizures for a year. R. at 853–54. She also noted that he had a history of depression but never sought mental health treatment and that he suffers short-

term memory loss. *Id.* In September 2017, Ms. Zielinski again noted at least two seizures per week, some with "loss of awareness" and others with "convulsions," as well as continued depression and "worsening" short-term memory. R. at 880. He has also reported a few generalized seizures resulting in loss of consciousness, incontinence, and tongue-biting. *See, e.g.,* R. at 899 (10/31/2017).

Ms. Zielinski prescribed various seizure medications, but her medical notes indicate Plaintiff sometimes failed to take his medication. *See, e.g.,* R. at 853–64 (7/6/2017 self-discontinued Depakote), 880 (9/27/2017 compliant), 898 (10/31/2017 non-compliant); 56 (10/15/2018 compliant). He also repeatedly missed appointments. R. at 37 (1/15/2019 letter to Plaintiff regarding eight missed appointments). In addition, his urine has frequently tested positive for marijuana despite his consistent denial of illicit drug use. R. at 853–64, 880, 894–98. He has acknowledged that doctors have warned him against using marijuana because it can impact the effectiveness of his anti-seizure medication. R. at 181.

Regarding his medication non-compliance, in October 2017 Plaintiff visited the emergency room complaining that he had a seizure in which he lost consciousness and suffered an injury. R. at 893. The emergency room doctor, Dr. Binkley, contacted Ms. Zielinski who confirmed Plaintiff's history of "med non-compliance, trying to titrate up dose of lamictal but patient has been poorly compliant." R. at 898. Dr. Binkley believed Plaintiff's medication non-compliance caused the breakthrough seizure, although she also commented on a possible infectious cause. *Id.* In a November 2017 follow-up with Ms. Zielinksi, Plaintiff admitted he stopped taking his

medication because "he ran out of" it "and forgot to get it filled." R. at 1050. She concluded that his medication non-compliance caused his latest seizure. *Id*. She also noted signs of depression and irritability and his "short term memory is still decreased and he needs to think before answering some questions." *Id*.

In contrast, the following year, on October 2018, Ms. Zielinski's treatment notes indicate that Plaintiff had begun taking his medication as prescribed and his seizure frequency had improved with "only 2 seizures in a little over 3 months." R. at 65. At this appointment, Ms. Zielinski discussed further increasing his seizure medication so "we can try to stop all the seizures." *Id*. She noted that he had a fair to good mood, still "some depression," but no anxiety and that his "short term memory is decreased but stable." *Id*.

In addition, Plaintiff suffers from hypertension and asthma. R. at 853–64, 880, 894–98. He also experienced left knee pain from an injury to his meniscus that he believes he sustained during an epileptic episode.[2] R. at 129–69, 183–84. Doctors surgically repaired the tear in April 2019. R. at 8–15.

### C. Medical Opinions and Statements

#### 1. Ms. Zielinski's June 2017 and June 2018 Letters

On June 5, 2017, Ms. Zielinski sent a letter to the SSA case reviewer, which she titled "Summary" of Plaintiff's "epilepsy". R. at 956. She noted that he had "medically intractable generalized seizures" and "decreased short term memory which is is [*sic*] worsening, higher executive functions impaired, medication side

---

[2] It remains unclear exactly when Plaintiff started complaining of left knee pain, but in a psychiatric interview in 2018, he reported that he injured his knee during an epileptic seizure in 2013. R. at 1137.

effects, weight loss, falls with seizures and injuries, etc." *Id.* Among other things, she stated that he currently has "one grand mal or generalized seizure per week" and "he is getting more depressed and anxious which is also impairing his daily function." *Id.* She asked the SSA to "review all these problems from seizures occurring as well as damage it has caused to other parts of his ability to function as well as the limitations it has placed on his independence." *Id.* On June 25, 2018, Ms. Zielinski re-submitted the exact same letter, changing only the date. *Id.* at 958.

### 2. Dr. Palacci's July 2017 Internal Medicine Evaluation

In July 2017, a state-agency medical consultant, Dr. Palacci, performed an internal medicine evaluation on Plaintiff. R. at 530–33. She did not have Plaintiff's medical records to review but based her examination on Plaintiff's statements to her. She noted a seizure disorder with 1–2 seizures per week, that he "is compliant with his medications," and claimed no drug use. *Id.* She found no neurologic focal deficits; under mental status, she wrote that Plaintiff "was alert and oriented to time, place and person"; could "recall 3 out of 3 items," name the current president, and perform simple arithmetic; had a normal affect"; and showed excellent "effort and cooperation." *Id.* She listed the following clinical impressions: (1) "Poorly controlled grand mal seizure disorder, by history"; and (2) "Well controlled hypertension." *Id.*

### 3. Dr. Kieffer's September 2017 Psychological Examination

Next, in September 2017, a state-agency psychiatric consultant, Dr. Kieffer, performed a psychological exam. R. at 840–44. Dr. Kieffer only had access to a single-page note from Ms. Zielinski dated March 11, 2013, which stated that Plaintiff had

"medically intractable partial epilepsy with secondary generalization and decreased short term memory" and his "seizures are currently very difficult to control" and he "cannot work at this time." *Id.* at 844. She examined Plaintiff and interviewed his mother, with whom he lived. *Id.* at 840–41. Dr. Kieffer's report did not ascribe Plaintiff's seizure disorder to a fall from a window but stated "he suffered several concussions while playing football and he and his mother trace the onset of his seizures to shortly after he played football." *Id.* at 840. Plaintiff denied any history of drug abuse and reported that he spent most of his time at home, where he requires continuous supervision because of possible seizures and remains dependent on his mother for many things, though he can dress himself and take care of his personal hygiene. *Id.* at 841. Plaintiff reported six seizures per week, and symptoms of depression with occasional hallucinations, but admitted no history of psychiatric treatment. *Id.*

Dr. Kieffer found Plaintiff oriented to person and place, but not time; and that he could provide significant information about himself, but his mother reported he had gaps in recall. *Id.* Dr. Kieffer noted that Ms. Zielinski's 2013 note reported "significant short-term memory loss" from seizures; Dr. Kieffer found Plaintiff: (1) "markedly impaired" in his capacity "for attention and concentration" and "arithmetic calculation"; (2) "somewhat impaired" in his capacity for "abstract conceptual reasoning" and "insight and social judgment"; and (3) had a fair "fund of general information." *Id.* at 841–42. She diagnosed Plaintiff with: (1) cognitive impairment

due to a seizure disorder and concussion; (2) major depressive disorder with mild psychotic symptoms; and (3) seizure disorder with history of concussion. *Id.*

### 4. Drs. Hinchen and Williamson's October 2017 Medical Record Review

As part of the Commissioner's October 2017 initial determination on Plaintiff's disability claim, state-agency psychiatric consultant, Dr. Williamson, and state-agency medical consultant, Dr. Hinchen, reviewed Plaintiff's medical records, as well as the opinions of Drs. Kieffer and Palacci and Ms. Zielinski's 2017 letter. R. at 264–91. Both agreed that Plaintiff suffered from severe epilepsy and a depressive disorder. *Id.* at 269. Dr. Williamson—who opined on Plaintiff's mental limitations—found that Plaintiff had mild limitations in his ability to understand, remember, or apply information and moderate limitations in his ability to interact with others and concentrate, persist or maintain pace. *Id.* at 273–74. Dr. Williamson also found that Plaintiff had no limitations in his ability to adapt and manage himself and retained a sufficient mental capacity to "carry out 1–2 step instructions/tasks," sustain effort for a normal work period, make simple work decisions, interact and communicate with others in a work setting, and adapt to simple routine changes and pressures in the work environment. *Id.* Dr. Hinchen—who opined on Plaintiff's physical limitations—found that Plaintiff's conditions imposed no exertional limitations, but he should not climb ladders, ropes or scaffolds, and should avoid concentrated exposure to noise and all exposure to hazards because of migraines and his seizure disorder. *Id.* at 271–72.

7

### 5. Drs. Taylor and Bilinsky's December 2017 Medical Record Review

As part of the SSA's December 2017 reconsideration of its initial denial of Plaintiff's disability claim, state-agency psychiatric consultant, Dr. Taylor, and state-agency medical consultant, Dr. Bilinsky, re-reviewed the medical record along with additional records that Plaintiff provided. R. at 294–325. Dr. Taylor agreed with Dr. Williamson that Plaintiff had moderate limitations in his ability to interact with others and concentrate, persist, and maintain pace; but he found that Plaintiff also had moderate (as opposed to mild) limitations in his ability to understand, remember, or apply information and mild (as opposed to no) limitations in his ability to adapt or manage himself. *Id.* Dr. Taylor also agreed with Dr. Williamson that Plaintiff retained the mental capacity to "carry out 1–2 step instructions/tasks," sustain effort for a normal work period, make simple work decisions, and adapt to simple routine changes and pressures in the work environment; but he found that Plaintiff could only interact and communicate with others in a work setting with reduced social demands and could not work with the public on a continuous basis. *Id.* Dr. Bilinsky, for his part, agreed with Dr. Hinchen's earlier assessment on Plaintiff's physical limitations. R. at 323–24.

### 6. Dr. Amdur's July 18 Psychiatric Evaluation

In July 2018, while Plaintiff's appeal to the ALJ remained pending, his attorneys sought a psychiatric evaluation from Dr. Mark Amdur. R. at 1137–42. Dr. Amdur interviewed Plaintiff alone and reviewed Dr. Kieffer's September 2017 report and the June 2018 letter from Ms. Zielinski (but no other medical records). *Id.* at

1137. In a written report, Dr. Amdur stated that he regarded Plaintiff "as being a poor historian," who was "vague, irritable, and confrontational" with a "poor understanding and appreciation" that Dr. Amdur's "position was that of an advocate." *Id.* Dr. Amdur reported that Plaintiff repeatedly told him that he had no problems "beyond his seizures and left knee," but also claimed to have problems reading not linked to his seizure disorder; "bad frustration" with resulting "temper control problems"; "depression" because of his seizures; and frequent thoughts of suicide (including one suicide attempt). *Id.* at 1137, 1140. Plaintiff claimed he last smoked marijuana over a decade ago in high school. *Id.* Among other things, Dr. Amdur wrote that Plaintiff's responses suggested "an intellectual disability and obsessive reluctance to bend to the will of others" and that Plaintiff struggled to answer basic questions including spelling "world" and naming Chicago's mayor. *Id.* at 1138, 1140. Dr. Amdur also administered a "Montreal Cognitive Assessment" ("MoCA") and Plaintiff scored a 13 out of 30.[3]

Dr. Amdur concluded that Plaintiff had a "seizure disorder, intellectual disability, cognitive impairments, and very severe personality disorder." *Id.* at 1141. He opined that: (1) Plaintiff's cognitive and intellectual impairments would interfere with his ability to comprehend instructions and work without distraction; (2) his intellectual, cognitive and personality impairments would "grossly disrupt his ability to relate effectively and appropriately with coworkers and supervisors"; (3) he could

---

[3] The MoCA website states that the MoCA is a 30-question test "that helps healthcare professionals detect cognitive impairments" and explains that a score of 10–17 indicates a "moderate cognitive impairment" but that "research for these severity ranges has not been established yet." https://www.mocatest.org (last visited May 25, 2022).

not tolerate work stress; and (4) if granted disability, he could not manage his own money because of impaired judgment and "poor calculation skills." *Id.*

### D.    The ALJ's Decision

On November 15, 2018. ALJ Suffi issued an opinion finding Plaintiff not disabled based upon her review of the record and testimony during an August 7, 2018 hearing. R. 107–24.  In making this finding, she applied the required five-step test set out in 20 C.F.R. § 404.1520(a)(4) to determine whether:  (1) Plaintiff had performed any substantial gainful activity during the period for which he asserted disability; (2) Plaintiff has a severe medically determinable impairment ("MDI") or combination of MDIs; (3) Plaintiff's impairment meets or equals any listed impairment; (4) Plaintiff retains the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether Plaintiff's RFC allows him to perform any other work existing in significant numbers in the national economy.  *Id.*; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 3, 2016 (Step 1); and had the following severe MDIs: seizures, headaches, left knee degenerative joint disease and tear, cognitive disorder, and major depressive disorder (Step 2).  R. at 112–13.  She also found that Plaintiff had non-severe MDIs from asthma and hypertension, but that the record did not support any learning or intellectual disabilities.  R. at 113–14.

She next examined whether Plaintiff's MDIs individually or in combination met or equaled a listed impairment, (Step 3).  R. at 114–15.  As relevant to this appeal, she examined medical listings 11.02 (epilepsy), 12.04 (depressive, bipolar and related

10

disorder), and 12.11 (neurodevelopmental disorders). *Id*. at 114. *See* 20 CFR Part 404, Subpart P, Appx 1.

To meet the requirements for medical listing 11.02 (epilepsy), a claimant must present evidence of seizures with a requisite frequency and duration (varying based on type of seizure) despite adherence to prescribed treatments as well as marked limitations of at least one of the physical or mental functions set out in the rule. Although the ALJ acknowledged that the record showed a history of different types of seizures, she found that: (1) "the claimant has not been consistently compliant with treatment"; (2) "has an ongoing history of marijuana use"; and (3) the record does not show seizures with the requisite frequency and duration despite adherence to a prescribed treatment. R. at 114–15.

To meet the requirements for mental impairment listing 12.04 (depressive, bipolar and related disorder) or 12.11 (neurodevelopmental disorders), a claimant must satisfy various criteria, designated under Paragraphs A, B and C. For listing 12.04, a claimant must satisfy requirements A and B or A and C; for 12.11, the claimant must satisfy A and B. The ALJ first looked at Paragraph B criteria, which requires at least one extreme or two marked limitations in broad areas of functioning, including "understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; or adapting or managing themselves." R. at 115. The ALJ noted that "extreme limitation" means an inability to function independently, appropriately, or effectively, and on a sustained basis, while "marked limitation" means a serious limitation to so function. *Id*. The ALJ

found that Plaintiff did not satisfy Paragraph B criteria because the record supported only moderate limitations in the following functions: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. *Id.*

The ALJ next looked at Paragraph C criteria. R. at 116. Paragraph C requires evidence of medically documented history showing the mental disorder existed for at least two years and that either (1) the claimant relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish symptoms; or (2) despite diminished symptoms, the claimant has achieved only "marginal adjustment," which means that the claimant's "adaptation to the requirements of daily life is fragile." *Id*; 20 CFR Part 404, Subpart P, Appx. 1. The ALJ found no evidence of treatment to satisfy (1), nor did the record show Plaintiff "has only marginal adjustment." R. at 116. Overall, at Step 3, the ALJ found that Plaintiff's MDIs did not satisfy any medical listed impairments listed in 20 CFR Part 404, Subpart P, Appx 1.

Turning to Step 4, the ALJ considered Plaintiff's medical record, the medical opinions, Plaintiff's testimony about his symptoms, as well as the testimony and submissions of third parties. She found that Plaintiff's MDIs could reasonably be expected to cause his alleged symptoms, but found Plaintiff's statements concerning the intensity, persistence and limiting effect of symptoms "not entirely consistent with the medical evidence and other evidence in the record." R. at 122.

Plaintiff had testified that he experienced seizures quite often and claimed difficulties reading, remembering, and understanding with a history of special education classes; that he panics in stressful situation; and that he struggles to get words out. He claimed his medication has not worked and he stopped taking some merely because he was "trying to figure out which medications worked best for him." He also claimed he never smoked marijuana and insisted that he only tested positive because of second-hand exposure. He acknowledged that he has never sought mental health treatment. In addition, Plaintiff's girlfriend testified about frequent seizures and Plaintiff's mother and sister submitted letters regarding his frequent seizures. The ALJ agreed that the record showed that Plaintiff had a history of seizures but found Plaintiff and his family only partially credible because "the record also supports" that many of his "seizures were due to his noncompliance with his medications" and because his family's claims often changed during his treatment. R. at 117. She also did not find credible his claims that he only tested positive for marijuana because of second-hand exposure. *Id.*

Overall, the ALJ found that, even with Plaintiff's MDIs, he still had the RFC to perform light work, and could occasionally kneel, crouch, crawl and climb ramps, never climb ladders, ropes or scaffolding; never perform work tasks involving exposure to extraordinary hazards such as unprotected heights and dangerous unguarded moving mechanical parts; never operate a motor vehicle; never operate machinery; and never work in loud noise environments or in temperature extremes. The ALJ also found that Plaintiff could understand, remember, carry out and adapt

to the demands of only simple routine work tasks; make no more than simple work-related decisions on a sustained basis; and perform only goal-oriented tasks and never fast-paced production line work tasks that are timed. The ALJ also held that, due to stress, Plaintiff could not perform work tasks that require interaction with the general public. R. at 116. The ALJ also found that none of Plaintiff's past prior work satisfies the recency, durational, and earning requirements to qualify as past relevant work under 20 CFR 404.1565 and 416965. R. at 122.

Under the fifth and final step, the ALJ considered Plaintiff's age, education, work experience and RFC along with the third-party VE's testimony and found that Plaintiff could perform occupations such as Hotel Housekeeper, Sorter, or Inspector. R. at 124. Accordingly, the ALJ concluded that Plaintiff was not disabled from September 3, 2016 through November 15, 2018, the date of the ALJ's decision. *Id*.

## II. Standard of Appellate Review

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An ALJ's findings of fact on disability are "conclusive" as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938)). Thus, courts must affirm an adequately supported denial, "even if reasonable minds could differ." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Further, an "ALJ is not required to address every piece of evidence or testimony presented," but the ALJ must "provide a 'logical bridge' between the evidence" and the ALJ's conclusions. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). A court will remand a decision if it lacks evidentiary support or adequate discussion of the issues to form this requisite logical bridge. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

### III.    Analysis

Plaintiff argues that the ALJ made three errors in the disability determination: (1) the ALJ improperly rejected certain medical opinions; (2) the ALJ's RFC finding failed to properly account for Plaintiff's moderate limitation in concentration, persistence and pace; and (3) the ALJ failed to consider his impairments in combination. [12]. The Court considers each argument in turn.

### A.    Whether the ALJ Improperly Rejected Medical Opinions

Plaintiff complains that the ALJ's decision improperly rejected or discounted numerous medical opinions. First, he complains that the ALJ incorrectly found that Ms. Zielinski's June 2017 and June 2018 letters did not constitute "medical opinions." [12] at 11–14. Second, he complains that the ALJ improperly rejected Drs. Kieffer and Amdur's psychiatric opinions. *Id.* at 14–15. Third, and finally, he argues that the ALJ improperly rejected Drs. Williamson and Taylor's opinions that Plaintiff could only complete 1–2 step/instruction tasks. *Id.* at 15.

15

### 1.    Ms. Zielinski's June 2017 and June 2018 Letters

As discussed above, Ms. Zielinski, an advanced nurse practitioner and Plaintiff's treatment provider through Rush Epilepsy Center, sent the SSA a June 5, 2017 letter, which she titled a "Summary" of Plaintiff's "epilepsy." R. at 956.  She re-submitted the letter on June 25, 2018, changing only the date. R. at 958.  The ALJ did not find Ms. Zielinski's letters persuasive, however, "because she did not provide a medical opinion." R. at 119.  Plaintiff complains that the meaning of the ALJ's statement "is unclear." [12] at 12.  He argues that, if the ALJ implies that Ms. Zielinski opinion is not "medical" because she does not qualify as a medical source, then the ALJ finding cannot be supported because the rules on acceptable medical sources include advanced nurse practitioners.  *Id.* (citing POMS DI 22505.003). Further, Plaintiff insists that Ms. Zielinski's letter constitutes a medical opinion, and it shows that Plaintiff's epilepsy and seizure disorder met the requirements of listing 11.02 (epilepsy).  *Id.* at 12–14.

As the Commissioner correctly points out, the rules define a medical opinion as a "statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in performing work.  [18] at 6 (quoting 20 C.F.R. § 404.1513(a)(2)).  Upon reading Ms. Zielinski's letter, it becomes clear why the ALJ did not believe it met this definition.  Ms. Zielinski calls her own letter a "Summary" of Plaintiff's "epilepsy" and provides a brief outline of some of Plaintiff's ongoing challenges with seizures and the effect they have had on his short-term memory and depression.  *Id.*  After providing

16

this summary, she asks the SSA to "review all these problems from his seizures" and consider the damage and limitations they have caused. *Id*. Ms. Zielinski's own chosen language indicates that her letter does not offer a medical opinion as the SSA defines it, but instead offers a "summary" of Plaintiff's medical history and asks the SSA to determine how that history limits his ability to work.

Yet, even if Ms. Zielinski's letter constitutes a "medical opinion," the ALJ's purported mistake would constitute harmless error that would not warrant remand. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding an ALJ's error is harmless if remand on that basis "would not affect the outcome of this case."). Although the ALJ did not find Ms. Zielinski's letter "persuasive," she still considered Ms. Zielinski's treatment notes and the medical history that Ms. Zielinski discusses in her letter. That is, the ALJ considered Plaintiff's history of seizures and issues with medications; his depression; his short-term memory issues; his inability to drive, operate machinery, climb, and make decisions. R. at 116–19. She also considered his history of job loss apparently due to his seizure disorder. *Id*. Further, many of the other medical opinions that the ALJ considered (some of which she found persuasive) incorporated Ms. Zielinski's letter into their respective opinions to the extent they deemed appropriate. Thus, because the ALJ considered everything of substance in Ms. Zielinski's letter, remand would not change the outcome of the ALJ's decision on Plaintiff's disability status.

In addition, contrary to Plaintiff's insistence, Ms. Zielinski's letter, even if it constitutes a medical opinion, does not establish the requirements of listing 11.02

(epilepsy). As discussed above, listing 11.02 requires evidence of seizures of a certain type with a requisite frequency and with "adherence to prescribed treatments." Although the letter generally states that Plaintiff has had "one seizure per week," it does not address Plaintiff's adherence to prescribed treatments. Ms. Zielinski's treatment notes, however, do so; and, as discussed above, those notes repeatedly comment that Plaintiff failed to take his medication as prescribed. The ALJ's decision makes clear that Plaintiff's history of medication non-compliance constituted a significant factor in her final determination. R. at 114–22; *see also Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) (holding a person may be denied disability benefits if he or she fails to follow a prescribed course of treatment). Thus, even if the ALJ erred when she found Ms. Zielinski's letter did not qualify as a "medical opinion" and even if the ALJ had credited Ms. Zielinski's statement in her letter about the frequency of Plaintiff's seizures, remand would not change the outcome as to the ALJ's listing 11.02 findings.

### 2. Drs. Kieffer and Amdur's Psychiatric Examination

Drs. Kieffer and Amdur conducted consultative psychiatric examinations of Plaintiff, but the ALJ found both these opinions unpersuasive. R. at 119–21. Dr. Kieffer opined that Plaintiff had a markedly impaired capacity for attention/concentration and arithmetic calculations; a fair fund of general information; a somewhat impaired capacity for abstract conceptual reasoning, insight and social judgment; and an inability to manage his own funds. R. at 840–44. Dr Amdur agreed, adding among other things that he believed Plaintiff had cognitive

18

and intellectual disabilities that would interfere with his ability to comprehend instructions and work without distraction, and he had a severe personality disorder that would grossly disrupt his ability to work with others. R. at 1137–42. As to Dr. Kieffer, the ALJ found that the medical records only partially supported her opinions and that Plaintiff exhibited much higher functioning during Dr. Palacci's internal medicine consultative examination. R. at 120. As to Dr. Amdur, the ALJ found that the record did not support his conclusions and that Plaintiff misinformed Dr. Amdur about his marijuana use; this suggested, to the ALJ, that Plaintiff "is not a reliable historian" and that Dr. Amdur based his diagnosis on "incorrect or unreliable information." R. at 121. The ALJ also found unpersuasive Dr. Amdur's diagnosis of an intellectual and learning disability because he did not perform appropriate testing.

Plaintiff complains that the ALJ erred in rejecting these opinions. As to Dr. Kieffer, he insists that the ALJ erred in favoring an internist's opinion over that of a mental health expert, citing *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995). [12] at 14. He also argues that the ALJ failed to cite which evidence contradicted each doctors' diagnoses. *Id.*

The Court disagrees. First, in *Wilder*, an ALJ rejected a lone expert medical opinion from a psychiatrist about the onset of Wilder's depression, finding that Wilder's medical records at the time did not mention any complaints of depression. 64 F.3d at 336. The Seventh Circuit remanded, holding that the "medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection

19

of the urinary tract to diagnose depression." *Id.* at 337. In this case, however, the ALJ did not reject Dr. Kieffer's analysis based on the *absence* of any mention of Plaintiff's mental status in Dr. Palacci's report; instead, the ALJ focused on Dr. Palacci's discussion of Plaintiff's mental status and her findings that he remained alert, oriented to time, place and person; could recall 3 out of 3 items; knew the current president; could perform simple arithmetic; had normal affect; and exhibited excellent effort and cooperation. R. at 532. Thus, *Wilder* remains distinguishable.

Second, contrary to Plaintiff's contention, the ALJ did, in fact, describe the medical records that contradicted Drs. Kieffer and Amdur. *See* R. at 116–28. In addition, further distinguishing this case from *Wilder*, these medical records did not address only "purely physical ailments," but routinely addressed the extent to which Plaintiff's conditions had impacted his short-term memory, cognitive function, and mental status. *Id.* The ALJ acknowledged that these records documented some cognitive and mental issues, but that they did not reflect the severity Drs. Kieffer and Amdur found. R. at 119. Notably, Plaintiff fails to cite to any medical records that the ALJ ignored or that documented cognitive and intellectual disabilities as severe as Drs. Kieffer and Amdur found.

As to Dr. Amdur, specifically, Plaintiff also argues that the ALJ should not have cited Plaintiff's marijuana use as a reason to reject Dr. Amdur's findings because Dr. Amdur acknowledged that Plaintiff "is not a reliable historian." [12] at 14. This, however, misses the ALJ's point. Dr. Amdur did not have access to Plaintiff's medical files (other than Dr. Kieffer's report and Ms. Zielinski's letter). Thus, he based his

findings on Plaintiff's statements during their session together. Accordingly, it remains reasonable for the ALJ to discount a medical opinion that relied upon the statements of someone with credibility problems.

Plaintiff also argues that the ALJ should have credited Dr. Amdur's opinion because Dr. Amdur relied on Dr. Kieffer's report and Ms. Zielinski's letter and "is presumably able to make a diagnosis based on his evaluation as a trained psychiatrist." *Id*. But this just goes to whether the ALJ *could* have accepted Dr. Amdur's opinion, it does not mean the ALJ had to do so. The Seventh Circuit has made clear that, "even if reasonable minds could differ," the Court must affirm the ALJ's determination "if the decision is adequately supported." *Elder*, 529 F.3d at 413 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

Finally, Plaintiff argues that the ALJ ignored that Dr. Amdur administered a MoCA that further supported his diagnosis. *Id*. at 15. The Court disagrees. The MoCa is a cognitive function test. Dr. Amdur's report discussed at length Plaintiff's perceived intellectual disability and how this may impact his ability to work separate and apart from his cognitive functioning (from short-term memory loss or otherwise). The ALJ reasonably rejected the intellectual disability findings because Dr. Amdur did not administer an intellectual function test; the medical record did not indicate intellectual impairments that would affect his RFC beyond the limitations the ALJ imposed; and Plaintiff had credibility issues.

Again, this Court cannot reject the ALJ's determination just because "reasonable minds could differ" on the findings. Plaintiff bore the burden to establish

an intellectual and learning disability of the type he claimed, and the ALJ reasonably found the record fell short in this regard. Reading the ALJ's decision as a whole and giving it a "commonsensical reading rather than nitpicking at it," this Court sees no "fatal gaps" in the ALJ's reasoning with respect to Drs. Kieffer and Amdur. *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

### 3. State-Agency Psychiatrists' Williamson and Taylor

State Agency psychiatrists Hinchen and Bilinsky offered opinions on Plaintiff's mental RFC, which the ALJ found persuasive and largely adopted. The ALJ rejected, however, their finding that Plaintiff could only carry out tasks with 1–2 steps/instructions. R. at 120. Plaintiff argues that the ALJ failed to explain why the record did not support this limitation, which constitutes an error requiring remand. [12] at 15. The Commissioner ostensibly agrees, since it only argues on appeal that any error remains harmless. [18] at 12.

This Court agrees that the ALJ's decision does not explain how the record did not support this limitation, but it also agrees with the Commissioner that the error proves harmless. As the Commissioner points out, the Dictionary of Occupational Titles assigns levels of reasoning development to occupations; occupations that qualify as Level 1 only require an employee to have "commonsense understanding to carry out simple one- or two-step instructions." [18] at 12 (citing *Appx C: Components of the Definition Trailer*, DOT, https://occupationalinfo.org/appendxc_1.html)). Here, the ALJ found that Plaintiff could still perform the occupation of hotel housekeeper. R. at 123. This occupation requires a Level 1 for reasoning development. *See* DOT

Occupational Definition 323.687-014.  Accordingly, even if the ALJ had adopted Drs. Williamson and Taylor's 1–2 step/instruction limitation, her final determination would have remained the same.  Accordingly, the ALJ committed, at most, harmless error.

### B.   Whether ALJ Properly Accounted for Plaintiff's Moderate Limitation in Concentration, Persistence and Pace

At Step 3, the ALJ found that Plaintiff did not have a mental impairment meeting the criteria for listings 12.04 (Depressive, bipolar and related disorders) or 12.11 (neurodevelopmental disorders) but found that Plaintiff had a moderate limitation with regard to concentrating, persisting, or maintaining pace.  R. at 115. Plaintiff argues, however, that the ALJ failed to account for this moderate limitation in her RFC determination and the hypotheticals she posed to the vocational expert. [12] at 9–10.   Although the ALJ's RFC placed certain limitations on Plaintiff regarding performing tasks, Plaintiff—relying on two Seventh Circuit cases, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2016) and *Winsted v. Berryhill*, 915 F.3d 466, 470–72 (7th Cir. 2019)—argues that "restrictions to simple, repetitive tasks do not account for significant problems in concentration, persistence, and pace." [12] at 9.

In *Winsted*, 915 F.3d at 466, which relies on *O'Connor-Spinner*, the Seventh Circuit held that an ALJ failed to properly account for a claimant's moderate difficulty with concentration, persistence, and pace where the ALJ found that the claimant could only perform jobs involving "simple, routine, repetitive tasks with few workplace changes," but failed to pose hypotheticals to the vocational expert to

23

properly account for the claimant's concentration-functioning deficit. The Seventh Circuit stated: "Again and again, we have said that when an ALJ finds there are documented limitations in concentration, persistence, and pace, the hypothetical question presented to the VE must account for these limitations." *Winsted*, 915 F.3d at 476 (internal citations omitted). It further stated, "in most cases employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace and, thus, alone, are insufficient to present the claimant's limitations in this area." *Id* at 477 (quoting *O'Connor-Spinner*, 627 F.3d at 620). There, the Commissioner had pointed to the ALJ's hypothetical on limitations in social interactions and argued that this accounted for the claimant's concentration difficulties. *Id*. The Seventh Circuit disagreed, finding that nothing in the ALJ's hypotheticals addressed the claimant's moderate problems with concentration, persistence and pace, *"without interacting with other people."* *Id*. (emphasis in original).

Plaintiff argues that the ALJ's decision in this case suffers from the same flaws as the decision in *Winsted*. Here, at Step 4, the ALJ found that Plaintiff could understand, remember, carry out, and adapt to demands of only simple, routine work tasks and make no more than simple work-related decisions on a sustained basis. R. at 116. The ALJ also found that Plaintiff could never perform fast-paced production-line work tasks that were timed and could not perform work tasks that require interaction with the general public due to stress. *Id*. Plaintiff insists that, pursuant

24

to *Winsted*, these limitations do not properly account for the moderate problems with concentration, persistence, and pace that the ALJ acknowledged at Step 3. Plaintiff also points to the hypotheticals his own attorney posed to the VE regarding someone who needs twice-monthly unscheduled work breaks; has unexpected absences 8–10 times per year; or who remains off-task 20 percent of the workday, [12] at 9–10 (citing R. at 198). As to each, the VE testified that no jobs existed. *Id.* Plaintiff argues that these hypotheticals all went to his problems with concentration, persistence and pace, yet the ALJ's decision ignored them. [12] at 10.

*Winsted* and the cases it cites, including *O'Connor-Spinner*, make clear that not all problems with concentration, persistence and pace must result in the same limitations. Rather, these cases indicate that the hypothetical must account for the identified limitation but may vary depending on the source of the problems. *See Winsted*, 923 F.3d at 477 (collecting cases). Here, the ALJ's finding of moderate problems with concentration, persistence, and pace came in Step 3 when she evaluated the Paragraph B criteria for listing 12.04 and 12.11. There she found that these problems related to some documented "poor memory with an abnormal fund of knowledge" with occasional "impaired attention and concentration," but also "periods where he exhibited normal attention, concentration, and speech." R. at 115. The ALJ emphasized, however, that this finding did not constitute a mental RFC assessment. *Id.* at 116. Instead, she analyzed in Steps 4 how any mental impairments or problems may impact Plaintiff's mental RFC assessment. *Id.*

Elsewhere, the ALJ found that the record did not provide clinical support for any learning or intellectual disability and thus found no support for such an MDI. R. at 113–14. Further, she found unpersuasive Drs. Kieffer and Amdur's psychiatric evaluations, instead finding as persuasive the conclusions of state-agency consultants, Drs. Williamson and Taylor. Drs. Williamson and Taylor opined that Plaintiff had some limitations in his ability to understand, remember, or apply information and moderate limitations in his ability to interact with others and concentrate, persist, or maintain pace; but also opined that Plaintiff retained the ability to understand, remember, and concentrate sufficiently to carry out 1–2 step instructions/tasks over a sustained work period; could make simple work decisions; interact and communicate with others sufficiently in a work setting (although Dr. Taylor found he needed reduced social demands and could not work with the public on a continuous basis); and adapt to simple, routine changes and pressures in the work environment. R. at 120.

Thus, with the teaching of *Winsted* in mind, this Court must ask whether the hypothetical questions the ALJ presented to the vocational expert accounted for the limitations the ALJ adopted from Drs. Williamson and Taylor's opinions. The Court finds they did so. The ALJ asked the vocational expert to consider an individual who:

> can understand, remember, and carry out and adapt to the demands of only simple, routine work tasks, and make no more than simple work-related decisions on a sustained basis; can never perform fast-paced production line work tasks that are timed; only goal-oriented work tasks; no work tasks that require interaction with the general public.

26

R. at 197. Although the ALJ's hypothetical did not use the term "limitations on concentration, persistence, and pace," her hypothetical set out the specific types of limitations that she believed the record supported with respect to any problems with Plaintiff's concentration, persistence, and pace.

Plaintiff argues that the ALJ's hypotheticals still failed to account for limitations associated with this problem because, according to Plaintiff, "his seizures, memory deficits, and depression would reasonably have resulted in extra breaks, absences, and off-task time in excess of competitive standards," *id*. at 10. As the Commissioner correctly points out, however, [18] at 13, Plaintiff does not identify any medical record that recognizes such a limitation and the ALJ found Plaintiff's testimony incredible. The ALJ did not have to pose hypotheticals for unsupported or undocumented limitations.

### C. Whether the ALJ Failed to Consider Plaintiff's Impairments in Combination at Step 3

Finally, in a cursory paragraph, Plaintiff argues that the ALJ erred in concluding that Plaintiff only had moderate limitations in his ability to understand, remember, and apply information because, she concluded, Plaintiff's seizure disorder caused most of the problems in this area. [12] at 11. Plaintiff insists that this reasoning is improper because Plaintiff had severe MDIs from a seizure disorder, cognitive disorders, and major depressive disorders and "it does not matter which of his conditions is the cause of his limitations in this area if he is not able to function within the tolerances for competitive employment." *Id*.

27

Plaintiff's argument remains undeveloped in his opening brief, but on reply he clarifies that he believes that the "ALJ failed to explain how the combined impact of" his "seizure disorder and mental impairments affected his ability to understand, remember, and apply information." [19] at 4. He continues that, if the ALJ had properly considered the combined impact of his MDIs, then the ALJ would have found at Step 3 that Plaintiff met Listing 11.02 (Epilepsy). *Id.* at 3–5.

Plaintiff's theory—even if he had properly raised it in his opening brief[4]—fails. The ALJ cites to numerous medical records to support her finding that Plaintiff's seizure disorder (rather than other impairments) caused his problems with understanding, remembering, and applying information. R. at 115. Elsewhere, she also found that the record showed that Plaintiff's seizure disorder markedly improved when he consistently took his prescribed medicine at the prescribed dosage, but that Plaintiff had a history of medication non-compliance. R. at 118. These findings create a "logical bridge" between her finding that the seizure disorder caused the problems at issue and that Plaintiff's problems were thus moderate because, when he took his medication, his seizure disorder remained well-controlled. *Getch*, 539 F.3d at 480.

Plaintiff insists that the 2017 letter (and identical 2018 letter) from his treating nurse practitioner Ms. Zielinski demonstrate that his mental disorders and epilepsy combined to cause sufficiently severe problems in this functional area to meet 11.02 criteria. But, as discussed above, the ALJ did not found Ms. Zielinski's

---

[4] A claimant waives "arguments by not developing them" and "by raising them for the first time only in his reply brief." *Brown v. Colvin*, 661 Fed. Appx. 894, 895 (7th Cir. 2016) (citing *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013)).

letters persuasive. Plaintiff does not point to any other record evidence to support his position. Instead, he merely complains that the state agency doctors also failed to consider all his conditions in combination and failed to review any medical evidence after December 2017. [19] at 4. But Plaintiff does not point to any evidence in the record after December 2017 (other than Ms. Zielinski's letter) that supports his position.

Plaintiff also insists that, since the ALJ found moderate limitations in his ability to understand, remember, and apply information because only Plaintiff's seizure disorder caused it, this implies that, if Plaintiff's mental impairments also caused it, "then the combination of seizures and the mental impairments" must result in a greater limitation in this functional area. [19] at 3. Plaintiff presents no medical or legal support for such a theory. As the Commissioner points out, "Plaintiff must do more than simply show proof of multiple impairments in order to qualify as disabled." [18] at 14 (quoting *Kathleen C. v. Saul*, No. 19-CV-1564, 2020 WL 2219047, at *6 (N.D. Ill. May 7, 2020)). While mental disorders and epilepsy, either alone or in combination, theoretically may cause severe problems in this functional area, Plaintiff bears the burden to present evidence that they did so in his case. He fails to meet this burden. Thus, Plaintiff has not established that the ALJ committed an error when she found that he had only moderate limitations in understanding, remembering, and applying information.

## IV.     CONCLUSION

For the reasons explained above, this Court finds that the ALJ's decision rests upon substantial evidence in the record.  Accordingly, the Court denies Plaintiff's motion for summary judgment [11], grants the Commissioner's motion for summary judgment [17], and affirms the Commissioner's decision to deny benefits.

Dated:  June 7, 2022                                         Entered:

John Robert Blakey
United States District Judge